**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| APRIL CHAPPELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV609 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Plaintiff, April Chappell, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 10 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 15; <u>see also</u> Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging an onset date of February 12, 2016. (Tr. 209-21.) Upon denial of those claims initially (Tr. 82-101, 129-33) and on reconsideration (Tr. 102-28, 138-46), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 147-48). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 35-68.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 13-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 6-12, 205-08), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2018.[2]
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since February 12, 2016, the alleged onset date.
>
> . . .

---

[2] In the Jurisdiction and Procedural History portion of the ALJ's decision, she identified Plaintiff's date last insured ("DLI") as "March 31, 2018" (Tr. 17 (emphasis added)); however, in the Findings of Fact and Conclusions of Law, the ALJ found that Plaintiff "me[t] the insured status requirements of the . . . Act through September 30, 2018" (Tr. 19 (emphasis added)). As all other references in the record to Plaintiff's DLI appear as March 31, 2018 (see Tr. 82, 91, 102, 115, 324, 367, 384, 403), the ALJ erred by finding that Plaintiff remained insured through September 30, 2018 (see Tr. 19). That error qualifies as harmless because, in light of Plaintiff's concurrent claim for SSI, the ALJ evaluated the entire period from Plaintiff's onset date of February 12, 2016, through the date of the ALJ's decision (see Tr. 27).

3. [Plaintiff] has the following severe impairments: status-post right foot fracture and fusion, De Quervain's tenosynovitis, and affective disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform sedentary work . . . except she can frequently stoop, kneel, crawl, crouch, and climb stairs; frequently push and pull with the right upper extremity; never push with the right lower extremity for foot controls; can perform simple, routine, and repetitive tasks; and would need the option to sit every 45 minutes for 1 to 5 minutes, but could continue working while seated.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from February 12, 2016, through the date of this decision.

(Tr. 19-27 (bold font and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for further administrative proceedings.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

4

is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[3] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

Case 1:20-cv-00609-WO-LPA   Document 17   Filed 07/21/21   Page 6 of 24

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignments of Error

According to Plaintiff, the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ err[ed] by failing to identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the VE and information in the [Dictionary of Occupational Titles ('DOT')], including its companion publication, the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ('SCO')] . . . or fail[ed] to explain how any conflict that ha[d] been identified was resolved" (Docket Entry 13 at 7 (italics omitted)); and

2) "[t]he ALJ fail[ed] to incorporate non-exertional limitations on the ability to stay on task where the ALJ first finds that [Plaintiff] was moderately impaired in the maintenance of [concentration, persistence, or pace ('CPP')]" (id. at 12).

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 16 at 5-12.)

## 1. Conflict Between VE and DOT

Plaintiff first asserts that "[t]he ALJ err[ed] by failing to identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the VE and information in the [DOT], including its companion publication, the [SCO] . . . or fail[ed] to explain how any conflict that ha[d] been identified was resolved" (Docket Entry 13 at 7 (italics omitted)), in violation of Social Security Ruling 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p"), and Pearson v. Colvin, 810 F.3d 204, 210-11 (4th Cir. 2015) (see Docket Entry 13 at 8). In particular, Plaintiff notes that, pursuant to the DOT, the jobs of "charge account clerk, document preparer, and call out operator . . . all require functioning at [Reasoning Development Level 3 ('RDL 3')]" (id.), which "requires the ability to carry out instructions furnished in written, oral, or diagrammatic form, and the ability to deal with problems involving several variables" (id. at 9 (citing DOT, App'x C ("Components of the Definition Trailer"), 1991 WL 688702 (4th ed. rev. 1991))). According to Plaintiff, "[a]n apparent conflict exists between [the RFC's] limitation to [simple, routine, and repetitive tasks

9

('SRRTs')] and [the DOT's] job requirements to perform at [RDL 3]."
(Id. at 11 (citing Diana F. v. Saul, No. 5:19CV43, 2020 WL 5526501,
at *4 (W.D. Va. July 31, 2020) (unpublished), Smith v. Berryhill,
No. 1:18CV225, 2019 WL 5783529, at *2 (M.D.N.C. Sept. 30, 2019)
(unpublished) (Schroeder, C.J.) (adopting recommendation of
magistrate judge), Eddie v. Berryhill, No. 5:16CV801, 2017 WL
4002147, at *8 (E.D.N.C. Aug. 24, 2017) (unpublished), and Yurek v.
Astrue, No. 5:08CV500, 2009 WL 2848859, at *9 (E.D.N.C. Sept. 2,
2009) (unpublished)).)  Plaintiff thus argues that, because "the
ALJ failed to identify and resolve th[at] conflict on the record"
(id. (citing Tr. 66)), the ALJ's "decision must be vacated,
reversed, and remanded for a new hearing and decision" (id. at 12).
That argument has merit and warrants remand.

SSR 00-4p places an affirmative duty on an ALJ to elicit an
explanation from the VE as to any "apparent unresolved conflict"
between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally
> should be consistent with the occupational information
> supplied by the [DOT].  When there is an apparent
> unresolved conflict between VE . . . evidence and the
> [DOT], the [ALJ] must elicit a reasonable explanation for
> the conflict before relying on the VE . . . evidence to
> support a determination or decision about whether the
> claimant is disabled.  At the hearings level, as part of
> the [ALJ's] duty to fully develop the record, the [ALJ]
> will inquire, on the record, as to whether or not there
> is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added).  "[A]n ALJ has
not fulfilled his affirmative duty merely because the [VE] responds

'yes' when asked if her testimony is consistent with the [DOT]," Pearson, 810 F.3d at 208 (internal quotation marks omitted); thus, "[t]he ALJ independently must identify . . . where the [VE's] testimony seems to, but does not necessarily, conflict with the [DOT]," id. at 209 (emphasis added); see also id. (rejecting the Commissioner's argument that an "apparent" conflict meant only an "obvious" one).

As relevant to the instant case, the ALJ queried the VE whether an individual limited to SRRTs could perform any jobs existing in significant numbers in the national economy. (Tr. 62-65.) In response, the VE opined that such an individual would remain capable of performing the jobs of charge account clerk, document preparer, and call out operator, and provided the corresponding DOT codes for the three jobs, as well as their incidence in the national economy. (See Tr. 65.) The ALJ then asked the VE if her testimony harmonized with the DOT, and the VE responded that the DOT did not directly address time off-task and sit/stand options, that she based her testimony regarding such matters on her education, experience, and training, and that her testimony otherwise remained consistent with the DOT. (Tr. 66.)[7]

The ALJ subsequently adopted the VE's testimony as to Plaintiff's ability to perform the three jobs in question:

---

[7] Although Plaintiff's counsel cross-examined the VE regarding the impact of monthly absences on the available jobs, he did not query the VE regarding the jobs' RDLs. (See Tr. 66.)

> To determine the extent to which [the RFC's non-exertional limitations] erode the unskilled sedentary occupational base, through the date last insured, the [ALJ] asked the [VE] whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]. The [VE] testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:

| Job | Exertional Level | SVP/Skill Level | [DOT] Number | Jobs Nationally |
|---|---|---|---|---|
| Charge Account Clerk | Sedentary | 2/Unskilled | 205.367-014 | 74,700 |
| Document Preparer | Sedentary | 2/Unskilled | 249.587-018 | 80,000 |
| Call Out Operator | Sedentary | 2/Unskilled | 237.367-014 | 99,300 |

> <u>Pursuant to SSR 00-4p, the [ALJ] has determined that the [VE's] testimony is consistent with the information contained in the [DOT]</u>. Although a sit/stand option is not found in the [DOT] and therefore SSR 00-4[p] is not applicable to this provision, the [ALJ] relied on the [VE]'s professional experience, who determined that the above identified work could be performed with this limitation and the [ALJ] accepts his testimony.

> Based on the testimony of the [VE], the [ALJ] concludes that, considering [Plaintiff]'s age, education, work experience, and [RFC], [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(Tr. 27 (emphasis added).)

The United States Court of Appeals for the Fourth Circuit has found an apparent conflict between jobs that require RDL 3 and a limitation to "short and simple instructions," based upon the following rationale:

> In reaching this conclusion, we consider not only the [DOT]'s definitions of [RDL] 1 and 3, but also the [DOT]'s definition of [RDL] 2. [RDL] 2 — which is more demanding than [RDL] 1 but less demanding than [RDL] 3 — is defined as the ability to apply commonsense

12

> understanding to carry out *detailed but uninvolved* written or oral instructions.
>
> A limitation to short and simple instructions appears more consistent with [RDL] 1 or [RDL] 2 than with [RDL] 3. Indeed, it seems that such a limitation falls somewhere between [RDL] 1 and 2. That is, a short and simple instructions restriction shares the word "simple" with the [RDL] 1 definition but could permit instructions of more than two steps. On the other hand, it is not entirely clear to us that a person limited to short and simple instructions can also carry out [RDL] 2 jobs that include "detailed but uninvolved" instructions. Because [RDL] 3 is more demanding than [RDL] 2 by the very nature of the Reasoning Development scale, it appears that [RDL] 3 jobs require more than the ability to carry out short and simple instructions. That determination is also supported by the fact that — unlike the definitions of [RDLs] 1 and 2 — [RDL] 3's definition places no explicit limitation on the complexity of the instructions to be carried out; instead, [RDL] 3 describes only the form of those instructions. We therefore conclude that an apparent conflict exists between a limitation to short and simple instructions and [RDL] 3 occupations.

Keller v. Berryhill, 754 F. App'x 193, 197-98 (4th Cir. 2018) (internal quotation marks, brackets, footnotes, and citations omitted). Significantly, the Fourth Circuit observed in a footnote that "[s]everal other courts of appeals have relied on precedent addressing a simple <u>tasks</u> limitation when considering a simple <u>instructions</u> limitation" and "conclude[d] that it [wa]s appropriate to do the same in [<u>Keller</u>]." <u>Keller</u>, 754 F. App'x at 197 n.4 (emphasis added). Accordingly, the Court should find <u>Keller</u>'s reasoning applicable to limitations involving simple, routine, and repetitive <u>tasks</u>, as in the instant case (<u>see</u> Tr. 21).

Moreover, the majority of rulings on this issue by judges of this Court have held that an apparent conflict exists between a

13

limitation to SRRTs and jobs requiring an RDL of 3.  See, e.g., Smith, 2019 WL 5783529, at *2 ("Courts in this circuit have consistently held that [RDL] 3 jobs conflict with a limitation to [SRRTs]."); Dunn v. Berryhill, No. 1:17CV507, 2018 WL 3383421, at *4 (M.D.N.C. July 11, 2018) (unpublished) (Peake, M.J.), recommendation adopted, slip op. (M.D.N.C. Oct. 26, 2018) (Eagles, J.); Mullis v. Colvin, No. 1:11CV22, 2014 WL 2257188, at *1 (M.D.N.C. May 29, 2014) (unpublished) (Osteen, Jr., C.J.); Weaver v. Colvin, No. 1:10CV582, 2013 WL 3989561, at *12–13 (Aug. 2, 2013) (unpublished) (Webster, M.J.), recommendation adopted, 2013 WL 4768178 (M.D.N.C. Sept. 5, 2013) (unpublished) (Eagles, J.).

In light of Keller and the persuasive authority cited above from other judges of this Court, the ALJ erred by failing to identify and resolve the apparent conflict between the DOT's assignment of RDL 3 to all three jobs cited by the VE and adopted by the ALJ at step five of the SEP and the VE's testimony that an individual limited to SRRTs could perform those jobs, requiring remand.

## 2. CPP

Plaintiff's second and final assignment of error contends that "[t]he ALJ fail[ed] to incorporate non-exertional limitations on the ability to stay on task where the ALJ first f[ound] that [Plaintiff] was moderately impaired in the maintenance of CPP." (Docket Entry 13 at 12.)  More specifically, Plaintiff contends

14

that the Fourth Circuit has "noted that[] 'the ability to perform simple tasks differs from the ability to stay on task[ and o]nly the latter limitation would account for a claimant's limitation in [CPP]'" and thus "held that 'an ALJ does not account for a claimant's moderate limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work.'" (Id. (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) (internal quotation marks omitted)).) According to Plaintiff, "[a]part from the conclusory statement that 'additional mental restrictions are not supported,' the ALJ [] d[id] not adequately explain why further limitations in the RFC were not warranted." (Id. at 12-13; see also id. at 13-16 (containing Plaintiff's arguments as to why ALJ's discussion of mental evidence does not suffice under Mascio).) Plaintiff's contentions in this regard fall short.

The Fourth Circuit has indeed held that "the ability to perform simple tasks differs from the ability to stay on task," and that "[o]nly the latter limitation would account for a claimant's limitation in [CPP]," Mascio, 780 F.3d at 638. However, as the Fourth Circuit recently affirmed, in Mascio, the court held "that an ALJ cannot summarily 'account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work,' . . . [b]ut [the court] did not impose a categorical rule that requires an ALJ to always include moderate

15

limitations in [CPP] as a specific limitation in the RFC." Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (emphasis added). As a neighboring district court has explained:

> Mascio does not broadly dictate that a claimant's moderate impairment in [CPP] always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision . . . . An ALJ may account for a claimant's limitation with [CPP] by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Jones v. Colvin, No. 7:14CV273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015) (magistrate judge's recommendation adopted by district judge) (unpublished) (emphasis added). Here, the ALJ's decision provides a sufficient explanation as to why the RFC's restrictions to SRRTs (Tr. 21) adequately accounted for Plaintiff's moderate deficit in CPP.

First, the ALJ pointed out at step three of the SEP that Plaintiff remained able to "use Facebook" (Tr. 20), "manage her finances" (id.), "follow instructions completely" (Tr. 21), "pay attention" (id.), and "drive" (id.), as well as "clean, cook, take care of herself, and perform activities of daily living" (id.). In the ALJ's later discussion of the mental health evidence, she further noted that Plaintiff "report[ed] she [wa]s able to follow instructions, bathe herself, watch television, use the internet for Facebook, and grocery shop." (Tr. 24.) Plaintiff challenges the

16

ALJ's reliance upon such activities, arguing that "th[o]se statements address [Plaintiff]'s ability to perform discrete household tasks, not her ability to maintain concentration or pace for an extended period in the performance of successive tasks on a sustained basis as would be the case in a competitive work environment." (Docket Entry 13 at 15.) Plaintiff further notes that "[t]his [C]ourt has held that a limited discussion of mental impairments and ability to perform simple tasks 'bears little-to-no relation to [the claimant's] abilities in the area of [CPP], even as to [her] ability to sustain unskilled work.'" (Id. (quoting Culver v. Commissioner, Civ. No. 14-432, 2015 WL 4485268, at *3 (D. Md. July 21, 2015) (unpublished)).)[8]

Plaintiff's argument fails, because the ALJ did not rely solely on Plaintiff's abilities to engage in those activities to determine the mental RFC. As discussed in more detail below, the ALJ additionally discussed Plaintiff's mental health treatment and the mental opinion evidence to support the limitation to SRRTs. (See Tr. 23-25.) Moreover, Plaintiff herself did not place any concentration-based qualification on her ability to engage in those activities (see Tr. 40-61, 338-45) and thus cannot fault the ALJ for failing to consider a qualification about which Plaintiff did not testify. Plaintiff's ability to engage in those activities

_____

[8] Although Plaintiff attributes the Culver case to "[t]his [C]ourt" (Docket Entry 13 at 15; see also id. (citing case as "(M.D.N.C. July 21, 2015)")), the United States District Court for the District of Maryland actually issued that decision, see Culver, 2015 WL 4485268, at *1.

provides support, along with the other factors discussed below, for the ALJ's finding that, despite moderate limitation in CPP, Plaintiff remained capable of SRRTs (see Tr. 21).

Second, the ALJ's discussion of the opinion evidence supports her conclusion that, despite moderate limitation in CPP, Plaintiff remained capable of performing SRRTs (see Tr. 21). In that regard, the ALJ accorded "some weight" to the opinions of the reconsideration-level state agency psychological consultant (Tr. 24), explaining that the ALJ disagreed with the consultant's opinions that Plaintiff had no limitation in her ability to understand, remember, and apply information and moderate limitation in her abilities to interact with others and adapt and manage herself (Tr. 24-25; see also Tr. 107, 120), but credited the consultant's opinions that Plaintiff had moderate deficit in CPP (see Tr. 24, 107, 120) but nonetheless remained "[a]ble to sustain attention [and] concentration for the performance of SRRT's [sic]" (Tr. 111, 123 (emphasis added)). The ALJ's crediting of the consultant's above-described opinion sufficed under Mascio to explain the ALJ's conclusion that, despite moderate limitation in CPP, Plaintiff remained capable of performing SRRTs (see Tr. 21). See Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017) (rejecting the plaintiff's argument under Mascio where ALJ relied on opinions of consultative examiner and state agency psychological

18

consultant that, notwithstanding moderate deficit in CPP, the plaintiff could sustain attention sufficiently to perform SRRTs).

Third, the ALJ made the following observations regarding Plaintiff's mental health treatment:

- "[m]ental status examinations have been largely normal" and, "[i]n March 2017, [Plaintiff] did not appear anxious or depressed on examination and her cognition and memory were normal" (Tr. 24; see also Tr. 1060);

- "when offered medications and a referral to psychotherapy, she told her providers that she did not wish to seek mental health treatment and she felt that her mood was 'good'" (Tr. 24; see also Tr. 1061);

- "[i]n January 2019, [Plaintiff] denied experiencing any anxiety, depression, or insomnia" and, "[o]n examination, she appeared well-groomed, cooperative, displayed normal speech, and showed a normal affect" (Tr. 24; see also Tr. 1329-30); and

- "treatment for [Plaintiff's] condition has been limited and conservative in nature" and "[t]he record does not contain evidence of any inpatient hospitalizations for her mental health condition" (Tr. 24).

Plaintiff challenges the ALJ's above-quoted discussion of the mental health evidence on four grounds, none of which carry the day. (See Docket Entry 13 at 13-14, 15-16.)

First, Plaintiff criticizes the ALJ's statement that, "[i]n March 2017, [Plaintiff] did not appear anxious or depressed on examination and her cognition and memory were normal" (Tr. 24; see also Tr. 1060) because, during the visit in question, Plaintiff sought treatment of right foot pain rather than a mental

impairment.  (See Docket Entry 13 at 13 (citing Tr. 1059); see also
id. at 14 (objecting to ALJ's observations that, in January 2019,
Plaintiff denied mental symptoms and displayed a normal mental
status on examination (Tr. 24 (citing Tr. 1330)), because
"[t]h[o]se observations were also in the context of a visit for
chronic foot pain, wherein psychiatric observations would be of
only secondary concern").)  That argument rings hollow, because the
record does not contain any records from psychiatrists,
psychologists, counselors, or therapists and thus the ALJ
necessarily gleaned evidence of the nature and severity of
Plaintiff's affective disorder from non-mental treatment records.

Second, Plaintiff points out that the March 2017 treatment
record showed a labile affect, rapid and/or pressured speech, and
hyperactivity, which constitute "not normal but abnormal findings
on mental status exam[ination]."  (Id. (citing Tr. 1060).)
Plaintiff's argument, however, glosses over the ALJ's inclusion of
the word "largely" modifying the word "normal" in describing
Plaintiff's mental status examinations (Tr. 24), i.e., the ALJ
acknowledged that Plaintiff's mental status examination contained
some abnormal findings.  The entirety of the mental health findings
at the March 2017 examination consisted of the following:

> [Plaintiff's] mood appears not anxious.  Her affect is
> labile.  Her affect is not inappropriate.  Her speech is
> rapid and/or pressured.  She is hyperactive.  She is not
> agitated, not aggressive and not actively hallucinating.
> Thought content is not paranoid and not delusional.
> Cognition and memory are normal.  She does not exhibit a

<u>depressed mood.  She expresses no homicidal and no</u>
<u>suicidal ideation</u>.

(Tr. 1060 (emphasis added).)  The emphasized language reflects normal findings, which clearly predominate over the abnormal findings.  Thus, the ALJ did not err by remarking that "[m]ental status examinations have been <u>largely</u> normal."  (Tr. 24 (emphasis added).)

Third, Plaintiff argues that the ALJ erred when she found that, at the March 2017 office visit, Plaintiff "told her providers that she did not wish to seek mental health treatment" (Tr. 24 (citing Tr. 1061)), noting that Plaintiff actually "stated that 'she does not wish to seek mental health service <u>at DayMark</u>,' and requested another referral."  (Docket Entry 13 at 13-14 (emphasis added) (quoting Tr. 1061).)  The ALJ overstated the record by describing Plaintiff as having refused <u>any</u> further mental health treatment (<u>see</u> Tr. 24), as Plaintiff declined referral specifically to DayMark and requested another referral (<u>see</u> Tr. 1061); however, that overstatement qualifies as harmless under the circumstances of this case.  The record reflects that, between March 24, 2017, and May 3, 2017, a "mental health professional" evaluated Plaintiff "who did not push any treatment for depression" but "did recommend treatment for neuropathy" (Tr. 1079).  The record does not contain that evaluation by an unidentified "mental health professional," and no further mention of treatment by that individual or any other mental health professional appears in the record.  Accordingly,

Plaintiff has not shown that remand for an acknowledgment by the ALJ of this subsequent evaluation that did not result in "any treatment for depression" or any follow-up would have resulted in a more favorable outcome in her case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Fourth, Plaintiff disputes the ALJ's characterization of Plaintiff's mental health treatment as "'limited and conservative'" (Docket Entry 13 at 15 (quoting Tr. 24)), contending that "a district court in this circuit observed that because '[m]any potentially disabling conditions can be treated by routine and conservative treatment, the characterization of treatment as conservative alone does not provide any insight into the severity of a given condition and may even belie the condition's seriousness'" (id. at 15-16 (quoting Ellis v. Colvin, No. 5:13CV43, 2014 WL 2862703, at *9 (W.D. Va. June 24, 2014) (unpublished)) (internal quotation marks omitted)).

Plaintiff's citation to Ellis does not aid her cause, because in that case, the court specifically noted that "the treatment options available for fibromyalgia are all conservative in nature" and thus that "[a] claimant cannot be faulted 'for failing to pursue non-conservative treatment options where none exist.'"

22

<u>Ellis</u>, 2014 WL 2862703, at *9 (quoting <u>Lapierre–Gutt v. Astrue</u>, 382 F. App'x 662, 664 (9th Cir. 2010)). In contrast, the record here contains no psychiatric inpatient hospitalizations, no counseling or therapy sessions, and no visits to psychiatrists or psychologists, and shows that Plaintiff only took anti-depressant medication for a few days before discontinuing it for side effects and declining further psychiatric medication (<u>see</u> Tr. 525, 527, 1059). In light of those facts, the ALJ did not err by characterizing Plaintiff's mental health treatment as "limited and conservative." (Tr. 24.)

For the foregoing reasons, the Court should deny relief on Plaintiff's second issue on review.

### III. CONCLUSION

Plaintiff has established an error warranting remand.[9]

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated and that the matter be remanded under sentence four of 42 U.S.C. § 405(g), for further administrative proceedings to include identification and resolution of any apparent conflicts between the VE's testimony and the <u>DOT</u> in accordance with SSR 00-4p and <u>Pearson</u>. As a result, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) should be

---

[9] Plaintiff's Memorandum alternatively asks that the ALJ's "decision [] be vacated and reversed, or remanded, for a new hearing and decision." (Docket Entry 13 at 16.) In this case, the Court should opt for remand, because Plaintiff's Memorandum does not adequately develop a cogent argument justifying reversal for an award of benefits. (<u>See</u> <u>id.</u>)

Case 1:20-cv-00609-WO-LPA   Document 17   Filed 07/21/21   Page 23 of 24

granted in part, i.e., to the extent it requests remand, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) should be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

July 21, 2021